SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.
Justice Wecht delivers the Opinion of the Court with respect to Part II(A) and announces the Judgment of the Court. The Opinion is joined in full by Justices Todd and Donohue and Justice Mundy joins Part II(A).
OPINION
JUSTICE WECHT
In these discretionary appeals, we consider an unsettled question in the jurisprudence concerning the Fourth Amendment to the United States Constitution. That provision states:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. CONST. amend. IV.
In Payton v. New York , 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Supreme Court of the United States held *371 that the Fourth Amendment prohibits law enforcement officers from making a warrantless and nonconsensual entry into a residence for the purpose of conducting a routine felony arrest. In dictum expressed at the end of its opinion, the Payton Court stated that a warrant requirement for arrests in the home placed no undue burden on law enforcement, and that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Id. at 603, 100 S.Ct. 1371.[1] The following year, in Steagald v. United States , 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the High Court held that a warrant for an individual's arrest does not authorize an entry into the home of a third party not named in the arrest warrant. To protect third parties' interests in the privacy of their homes, the Steagald Court held, the Fourth Amendment's warrant requirement mandates a magistrate's determination of probable cause before police may enter those homes in order to search the premises for the individual named in the arrest warrant.
Read together, the Supreme Court's Steagald holding and Payton dictum suggest that an arrest warrant authorizes law enforcement to enter the home of the subject of an arrest warrant in order to effectuate his arrest, but that a separate search warrant is required to enter the home of a third party. Since Steagald , other courts routinely have wrestled with the application of these principles to particular factual circumstances. But the United States Supreme Court has not had occasion to revisit this important constitutional issue. The determination of the controlling rule is critical, because its application frequently will make the difference between a lawful home entry and an unlawful one.
Today's cases require us to consider the central question that distinguishes Steagald 's holding from Payton 's dictum , but which those decisions left wholly unaddressed. Specifically, when a law enforcement officer seeks to execute an arrest warrant inside a home, how it is to be determined that the home is that of the intended arrestee, such that the Payton dictum could apply, rather than the home of a third party, where Steagald will control? Our analysis of this issue necessarily implicates and concerns two principles that stand at the very heart of the Fourth Amendment: the essential protection of the privacy in one's home and the necessity of the warrant requirement.
*372 I. Background
In June 2011, Earnest Moreno absconded from the Diagnostic Rehabilitation Center ("DRC"), a halfway house in Philadelphia to which he had been released on state parole. A warrant was issued for Moreno's arrest, and Parole Agent Sean Finnegan undertook an investigation in order to locate Moreno and take him into custody. On August 26, 2011, Agent Finnegan, assisted by deputies of the United States Marshals Service, attempted to execute the arrest warrant at 4745 North 2nd Street, Philadelphia, believing that address to be Moreno's most likely place of residence. The residence actually was that of Moreno's half-brother, Angel Romero, and Romero's wife, Wendy Castro.
The agents did not find Moreno in the residence. However, upon searching the basement, the agents observed a large number of plants that appeared to be marijuana. Agent Finnegan contacted the Philadelphia Police Department and notified officers of the suspected marijuana-growing operation. Based upon this information, police officers obtained and executed a search warrant for the premises. This second search yielded sixty-one marijuana plants, a bag of marijuana, high-intensity heat lamps, a scale, a heat sealer, Castro's driver's license, mail addressed to Romero and Castro, a Smith & Wesson 9mm handgun, a loaded magazine, and a box of ammunition. Both Romero and Castro were arrested and charged with possession of a controlled substance, 35 P.S. § 780-113(a)(16), possession with intent to deliver a controlled substance, 35 P.S. § 780-113(a)(30), conspiracy, 18 Pa.C.S. § 903, and possession of an instrument of crime, 18 Pa.C.S. § 907.
Romero and Castro filed identical pre-trial motions requesting, inter alia , suppression of the evidence obtained from the search of their residence. On February 20, 2015, the trial court held a hearing on Romero's and Castro's motions to suppress. Both Romero and Agent Finnegan testified at the suppression hearing.
Agent Finnegan testified that, after he was tasked with apprehending Moreno, he conducted an investigation to determine Moreno's whereabouts. Agent Finnegan explained that, based upon several pieces of information, he determined 4745 North 2nd Street to be Moreno's most likely place of residence. See Notes of Testimony, Suppression Hearing ("N.T."), 2/20/2015, at 11-12. First, Agent Finnegan obtained this address from Moreno's most recent driver's license, which had expired in 2007. Second, when Moreno was arrested in 2009, he provided this address to the Philadelphia Police. Moreover, although Agent Finnegan could produce no documentation from DRC, he stated that an individual at DRC had informed him that Moreno used the 4745 North 2nd Street address as his point of contact while at the facility. Finally, Agent Finnegan testified that his investigation revealed that Moreno had family members residing at that address, but Agent Finnegan refused to reveal how he had obtained this information. Agent Finnegan explained that, due to his involvement with the United States Marshals Service, he would need to consult with the United States Attorney's Office before identifying his source. Id. at 24. Agent Finnegan admitted that there were other possible addresses where Moreno might be residing, but he stated that 4745 North 2nd Street "seemed to be most likely." Id. at 12.
Agent Finnegan proceeded to recount the circumstances of his August 26, 2011 entry into and search of the Romero/Castro residence. Agent Finnegan stated that, accompanied by his colleagues in the United States Marshals Service, he knocked on the door and announced the officers' presence, *373 and told one of the residents (whose identities were not yet known to the officers) that the officers had an arrest warrant for Moreno and "were allowed in the residence." Id. at 13. Upon further examination, Agent Finnegan clarified that, when the residents were asked whether the authorities could enter, those residents did not say "no," but Agent Finnegan could not recall whether they said "yes." Id. at 14-15. Agent Finnegan testified that the residents began to object to the search of their home once a member of the arrest team began to approach the basement. Id. at 15. Disregarding the residents' objections, the authorities entered the basement, whereupon they discovered the marijuana-growing operation. Agent Finnegan then contacted the Philadelphia Police Department, and "held the scene" until the responding officers arrived. Id. at 17.
Romero testified that, in August 2011, he lived at 4745 North 2nd Street with Castro and their two children, and that Moreno never resided in that home. Id. at 42-43. Romero explained that Moreno is his half-brother, but that he did not associate with Moreno because Moreno was a heroin addict. Id. at 44-45. Romero testified that he had not spoken to Moreno in approximately fifteen years. Id. at 45. Romero did not know where Moreno lived, did not know where Moreno lived in August 2011, did not know that Moreno had been on parole, and did not know that Moreno had listed 4745 North 2nd Street on his expired driver's license. Id. Romero further testified that Moreno did not receive mail at that address. Id.
Romero contradicted Agent Finnegan's account of the entry. Romero testified that he and Castro heard a knock on the door, and that Castro opened the door. As soon as she did so, Romero heard a "ruckus." Id. at 44. He got up, and the officers already were inside. Romero testified: "They just told me, 'Shut the fuck up; sit down,' and they said the same thing to [Castro], and they were searching the house." Id. Romero stated that neither he nor Castro consented to the search of their residence. Id.
Romero and Castro argued that the authorities' initial entrance into their home was unlawful under Steagald , in which the Supreme Court held that, absent a search warrant, an arrest warrant does not authorize the entry into a third party's residence. See Steagald , 451 U.S. at 222, 101 S.Ct. 1642. The suppression court reserved its legal conclusion pending further briefing, but placed its findings of fact on the record. Importantly, the suppression court reviewed the testimony of both Agent Finnegan and Romero, and specifically noted that "both individuals are, in fact, credible ...." N.T., 2/20/2015, at 53. Further, the court specifically found that Agent Finnegan did not have express permission to search the property, and that Romero and Castro objected to the search of the basement. Id.
After reviewing the parties' briefs and conducting its own review of the applicable law, the suppression court held a second hearing on April 17, 2015, following which it granted Romero's and Castro's motions to suppress. The Commonwealth filed interlocutory appeals pursuant to Pa.R.A.P. 311(d), certifying that the suppression order substantially handicapped its prosecution of the cases.[2]
On July 10, 2015, pursuant to Pa.R.A.P. 1925(a), the suppression court filed an opinion in support of its order.[3] The suppression *374 court contrasted the Steagald Court's holding with the Payton Court's observation that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton , 445 U.S. at 603, 100 S.Ct. 1371. Noting that precedent in the Superior Court of Pennsylvania has transformed the Payton dictum into a test of the reasonableness of a police officer's belief as to the residence of the intended arrestee, the suppression court determined that Agent Finnegan's belief that Moreno resided at 4745 North 2nd Street was not reasonable. Essentially, the suppression court rejected any information that the Commonwealth failed to support with documentation or corroboration, including the purported records from DRC and the testimony concerning Moreno's familial connections at the residence. The suppression court thus concluded that:
Agent Finnegan's sole basis for entering the Romero residence was the address listed on Moreno's expired driver's license and because Moreno had given that address to authorities in 2009. The license expired in 2007, almost five years before the search was conducted and Moreno last gave that address two years previously. No evidence was produced to show that the address was still valid for Moreno or that he used that address as his own at any time subsequent to 2009. Further, no evidence was produced to show a relative of Moreno's lived at the address or that Moreno had been seen in or about the residence on [or] near the date the authorities entered the premises.
Suppression Ct. Op., 7/10/2015, at 6-7.
Because the information that Agent Finnegan relied upon was stale, the suppression court determined that "a reasonable belief could not have been formed to suggest Moreno lived in the Romero residence." Id. at 7. Citing the Steagald Court's focus upon the primacy of third parties' interests in the privacy of their homes, the suppression court concluded that the authorities' entry into Romero's and Castro's residence was unlawful. The court opined that "the Commonwealth's rationale would presumably allow warrantless entries and searches of any address provided by a parolee without further grounds or suspicion. To adopt this type of rationale would be to render meaningless the protections of our State and Federal Constitutions against unreasonable searches and seizures." Id.
In a unanimous opinion, the Superior Court reversed the suppression court's order and remanded the case for trial. Commonwealth v. Romero , 138 A.3d 21 (Pa. Super. 2016).[4] Relying upon its previous *375 interpretations of Payton 's dictum , the Superior Court postulated that, "[w]here authorities have a reasonable belief that the subject of an arrest warrant lives within a given premises, they can enter the home and arrest the suspect without a search warrant." Id. at 25 (citing Commonwealth v. Muniz , 5 A.3d 345 (Pa. Super. 2010) ). The court concluded that its decision in Muniz controlled the disposition of the instant cases.
In Muniz , law enforcement officers armed with an arrest warrant for a fugitive entered the residence of a third party not named in the warrant, ostensibly believing the residence to be that of the fugitive, and ultimately discovered controlled substances in the third party's home. Notwithstanding the officers' mistake, and despite the defendant's invocation of Steagald , the Superior Court determined that the officers' belief as to the fugitive's residence was reasonable at the time of entry. Although the defendant asserted that the fugitive's approved parole address was in another city, and although the defendant's mother testified that only she and the defendant resided in the subject residence, the Superior Court concluded that such after-the-fact testimony was "irrelevant to what authorities believed on the morning of the incident." Muniz , 5 A.3d at 351. For the Superior Court, the material considerations were that the authorities received information from the fugitive's previous neighbor, conducted a LexisNexis search, and obtained a statement from another tenant of the targeted apartment building, all of which "corroborated the reasonable belief that [the fugitive] lived in (and could be found in) the apartment." Id. The entry into the third party's home was lawful, the Muniz court concluded, because, "so long as the authorities had reason to believe that the subject of an arrest warrant ... lived in and could be found in the apartment, they had a valid basis to search the apartment for the subject of that warrant." Id. at 352.
As in Muniz , the Superior Court in the instant cases concluded that Agent Finnegan possessed a reasonable belief as to Moreno's residence when he sought to execute the arrest warrant. In reaching this conclusion, the Superior Court relied in part upon aspects of Agent Finnegan's testimony that the suppression court had rejected. With regard to Moreno's alleged use of the address at DRC, the Superior Court noted that Agent Finnegan testified to that fact, that the suppression court found Agent Finnegan credible, and that Romero did not contradict Agent Finnegan's account. Accordingly, invoking its standard and scope of review, the Superior Court determined that all of Agent Finnegan's asserted justifications for his belief were facts within its purview.[5] Specifically, the Superior Court concluded that Agent *376 Finnegan's belief that Moreno resided at 4745 North 2nd Street was supported by:
(1) the address listed on Moreno's most recent, but expired, driver's license; (2) the address Moreno had given to the police department when he was arrested in 2009; (3) the address Moreno had given to the DRC in 2011 as a point of contact after being paroled; (4) the address Moreno listed while signing out of the DRC when he absconded in 2011; and (5) the fact that Moreno still had family living at that address.
Romero , 138 A.3d at 26 (citing N.T., 2/20/2015, at 11-12).
The Superior Court determined that "Agent Finnegan's testimony, supporting his belief that 4745 North 2nd Street was Moreno's most likely last place of residence, is as strong as the evidence that the police had in Muniz to believe that the fugitive in that case lived at the defendant's residence." Id. at 28. The Superior Court disregarded Romero's testimony that he did not associate with Moreno, that he had not spoken to Moreno in fifteen years, and that Moreno did not receive mail at the Romero/Castro address. As in Muniz , the Superior Court opined that these latter facts were "irrelevant to what Agent Finnegan's good faith belief was at the time he prepared and executed the arrest warrant for Moreno" in Romero's and Castro's home. Id. (citing Muniz , 5 A.3d at 351-52 ). Because "Agent Finnegan reasonably believed that Moreno's last place of address" was Romero's and Castro's home, and because the authorities possessed a valid arrest warrant for Moreno, the Superior Court concluded that those authorities "had the legal basis to enter [Romero's and Castro's] residence without a search warrant, despite the fact that Moreno was not inside the home." Id. Accordingly, the Superior Court reversed the order granting suppression, and remanded the case for trial.
Romero and Castro filed identical petitions for allowance of appeal with this Court, arguing that the Superior Court's opinion conflicts with Steagald and that the Superior Court erred in upsetting the suppression court's factual finding that Agent Finnegan did not have permission to enter Romero's and Castro's home. We granted the petitions, rephrasing the issues for our consideration as follows:
(1) In view of Payton v. New York , 445 U.S. 573 [100 S.Ct. 1371, 63 L.Ed.2d 639] (1980), and Steagald v. United States , 451 U.S. 204 [101 S.Ct. 1642, 68 L.Ed.2d 38] (1981), did the Superior Court err in concluding that an arrest warrant for Earnest Moreno authorized entry into the residence of Angel Romero and Wendy Castro for the purpose of executing the arrest warrant?
(2) Did the Superior Court apply an erroneous standard of review regarding the suppression court's finding of fact that the authorities did not have express permission to enter the residence of Angel Romero and Wendy Castro?
Commonwealth v. Romero , --- Pa. ----, 162 A.3d 1108 (2016) (per curiam ).
II. Analysis
At the outset, we set forth our well-settled standard and scope of review. When the Commonwealth appeals from an order granting suppression of evidence, the reviewing court "may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole." Commonwealth v. Mistler , 590 Pa. 390, 912 A.2d 1265, 1268-69 (2006). "Where the record supports the suppression court's factual findings, we are bound by those facts and may reverse only if the legal conclusions *377 drawn therefrom are in error." Commonwealth v. Johnson , 639 Pa. 196, 160 A.3d 127, 138 (2017). "Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, 'whose duty it is to determine if the suppression court properly applied the law to the facts.' " Commonwealth v. Jones , 605 Pa. 188, 988 A.2d 649, 654 (2010) (quoting Mistler , 912 A.2d at 1269 ). "Thus, the conclusions of law of the courts below are subject to our plenary review." Id.
A. Consent to enter the premises
We begin with the second issue, due both to its relative simplicity and to its reliance upon the appellate standard and scope of review. As noted, supra n.4, in framing the facts of this case, the Superior Court stated that, when Agent Finnegan knocked on the door, either Romero or Castro "answered the door and permitted the authorities to enter the premises." Romero , 138 A.3d at 23. Romero and Castro assert that the Superior Court erred because, although Agent Finnegan testified to that effect, Romero's testimony directly contradicted Agent Finnegan's account of his entry. Because Romero and Castro prevailed before the suppression court, they argue that a reviewing court may not rely upon Agent Finnegan's contradicted testimony. See Briefs for Romero & Castro at 28-29. Before this Court, the Commonwealth concedes that Romero and Castro did not provide consent to the entry into their home. See Brief for Commonwealth at 20. Instead, the Commonwealth contends that, "[u]nder Payton , it was not necessary for [Romero or Castro] to consent because the agents had an arrest warrant for Moreno and reasonably believed he resided at the same dwelling" as Romero and Castro. Id.
We agree with Romero and Castro that the Superior Court erred. In this regard, the suppression court could not have been more clear, finding as a fact "that the police officer did not have the expressed permission to search the property from the defendants." N.T., 2/20/2015, at 53. The only suggestion that Romero or Castro consented to the entry came from Agent Finnegan's testimony, which Romero's account of the events unquestionably contradicted. Because the Court of Common Pleas granted Romero's and Castro's motions to suppress, the Superior Court was not at liberty to consider any of the Commonwealth's contradicted evidence. See Mistler , 912 A.2d at 1268-69. As such, the Superior Court's statement that either Romero or Castro "permitted the authorities to enter the premises" was unsupported by the record. Consequently, lacking any claim of consent to Agent Finnegan's entry, the Commonwealth can prevail herein only by establishing a lawful basis for a nonconsensual entry into Romero's and Castro's home.
B. The authority provided by the arrest warrant
1. Parties' Arguments
With this conclusion in hand, we turn now to the parties' arguments regarding the central issue presented by these appeals: the interaction between Payton and Steagald in determining the scope of the authority provided by an arrest warrant to enter a private residence. Romero and Castro focus largely on their assertion that the information upon which Agent Finnegan relied was stale and, thus, could not have justified a reasonable belief that Moreno resided at 4745 North 2nd Street on August 26, 2011. The staleness of the information, they argue, distinguishes this case from both Payton and Steagald , because the investigations in those cases revolved *378 around "fresh" information regarding the arrestees' places of residence. See Briefs for Romero and Castro at 19-21. Romero and Castro further stress that the Commonwealth did not introduce the arrest warrant for Moreno into evidence at the suppression hearing, and they argue that the Superior Court impermissibly speculated as to the warrant's contents. Id. at 20.
Turning to the principles animating the Steagald decision, Romero and Castro argue that an arrest warrant protects its target from an unreasonable seizure, but fails to safeguard third parties' interests in the privacy of their homes. Id. at 22-23. Rather than focusing upon the factors that Agent Finnegan testified to having considered in making his determination about Moreno's residence, Romero and Castro argue that "the Superior Court should have reviewed the warrant that was reviewed by the issuing magistrate." Id. at 24. Romero and Castro proceed through the factors that Agent Finnegan identified, endorsing the suppression court's conclusion that no evidence was produced to suggest that Moreno used the address in question at any time after 2009. Authorizing law enforcement to enter a residence upon stale information of this sort, they argue, "condones the finding of a reasonable belief to search anyone's house if within the last five years an individual in contact with the criminal justice system listed the address as his residence." Id. at 25 (emphasis omitted).
Romero and Castro further question the Superior Court's reliance upon Muniz , arguing that the quantum and quality of evidence that the Commonwealth produced in the instant cases were inferior to the evidence that the Muniz court found to support a reasonable belief as to residence. Romero and Castro assert that this case aligns more closely with the Superior Court's application of Steagald in Commonwealth v. Martin , 423 Pa.Super. 228, 620 A.2d 1194 (1993).
In Martin , a woman saw her ex-husband, the eventual arrestee, in the home of another woman, Martin. Knowing that there were outstanding warrants for his arrest, the woman called the police to inform them of his whereabouts. When the officers arrived at Martin's house, they informed Martin that they had an outstanding arrest warrant for the man and that they were going to search Martin's house for him. Martin objected to the search, and demanded that the officers produce a search warrant. Notwithstanding Martin's protest, the officers searched her home and discovered their target in a hidden room on the third floor. Martin was charged with hindering apprehension. She moved to suppress evidence of the discovery of the arrestee in her home. Reviewing the denial of suppression, the Superior Court concluded that, pursuant to Steagald , the arrest warrant for the man did not authorize the search of Martin's home, and that the evidence derivative of that search must be suppressed. See Martin , 620 A.2d at 1196. Likewise here, Romero and Castro maintain that the arrest warrant for Moreno did not authorize a search of their home. Returning to the asserted staleness of Agent Finnegan's information, Romero and Castro note that the Martin court required suppression notwithstanding the fact that the police officers in Martin were acting upon "fresh and reliable information," a circumstance that is lacking in the instant cases. Briefs for Romero & Castro at 27.
The Commonwealth contends that the entry into and subsequent search of Romero's and Castro's home was lawful under Payton . The Commonwealth traces the Superior Court's application of the Payton dictum in several cases, as well as the *379 formulation of the rule in numerous other jurisdictions. See Brief for Commonwealth at 8-13. The Commonwealth particularly endorses the Superior Court's decisions in Muniz and Commonwealth v. Conception , 441 Pa.Super. 539, 657 A.2d 1298 (1995), in which that court applied the Payton dictum to conclude that an arrest warrant authorizes police officers to enter a third party's residence, so long as the officers reasonably believe that their target resides there at the time of their entry. "Here," the Commonwealth argues, "the Superior Court correctly held, pursuant to Payton , that the officers' entry of the residence did not violate [Romero's and Castro's] Fourth Amendment rights because Agent Finnegan and his colleagues had a valid arrest warrant for Moreno and a reasonable belief that he lived with [Romero and Castro]." Brief for Commonwealth at 13.
In light of the information available to Agent Finnegan, the Commonwealth contends that his belief "was well-founded and reasonable." Id. at 14. In addition to the official records suggesting Moreno's use of the address, the Commonwealth underscores the familial relationship between Moreno and Romero. This information, the Commonwealth contends, "was at least as reliable as the information police relied upon in Conception and Muniz placing fugitives in dwellings where they had no ostensible family ties." Id. The Commonwealth asserts that the suppression court found Agent Finnegan to be credible and incorporated his testimony into its findings of fact. Therefore, the Commonwealth maintains, the Superior Court correctly considered the information that Agent Finnegan related. Id. at 17-19.
The Commonwealth contends that, by focusing upon the purported staleness of the information at issue, Romero's and Castro's argument "rests on a fundamental misunderstanding of Payton and Steagald ." Id. at 15. The critical distinction between the disparate rules articulated in those cases, the Commonwealth asserts, is "whether the authorities believed the subject of the arrest warrant resided with the third-party complaining of the search, or whether they merely believed he might be found there." Id. (emphasis in original). In sum, the Commonwealth argues that, pursuant to Payton , the entry into Romero's and Castro's home was lawful "because the agents had an arrest warrant for Moreno and reasonably believed he resided at the same dwelling with [Romero and Castro]. Nothing more was required." Id. at 20.
2. Payton and Steagald
To resolve the question at bar, we must analyze the legal principles that the Supreme Court of the United States expounded in both Payton and Steagald . Although we also examine how other courts have applied these cases, we note that we are bound only by the United States Supreme Court's pronouncements upon this issue of interpretation of the United States Constitution. See Commonwealth v. Cross , 555 Pa. 603, 726 A.2d 333, 338 n.4 (1999) ("This court is not bound by a lower federal court's interpretation of United States Supreme Court decisions, but is bound only by the United States Supreme Court."). Further, because neither this Court nor the Supreme Court of the United States has applied these principles directly to the circumstance at issue, we write upon a blank slate in this Commonwealth.[6]
*380 Payton addressed two consolidated appeals challenging the constitutionality of New York statutes that purported to authorize police officers to enter a private residence without a warrant in order to make "a routine felony arrest." Payton , 445 U.S. at 574, 100 S.Ct. 1371. The first case concerned Theodore Payton, a suspect in a murder investigation. After developing sufficient probable cause to arrest Payton, but without obtaining an arrest warrant, police officers went to Payton's apartment to take him into custody. Music could be heard coming from within the apartment, and lights were on inside, but there was no response to the officers' knock on the door. Ultimately, the officers forced the door and entered the apartment. They did not locate Payton, but they discovered and seized an ammunition shell casing, which was later admitted as evidence in Payton's murder trial. In the second case, police officers sought to arrest Obie Riddick for armed robbery. Without obtaining an arrest warrant, the officers went to Riddick's house in an effort to apprehend him. The officers knocked, and Riddick's young son opened the door. Riddick was seated on a bed within the officers' field of view. The officers entered the house and arrested Riddick, and subsequently discovered narcotics and related paraphernalia in a nearby chest. Riddick was charged with narcotics offenses.
Both Payton and Riddick sought suppression of the evidence derivative of the police entries into their residences. Each was unsuccessful, and each was convicted. Ultimately, in a single opinion, the New York Court of Appeals affirmed both Payton's and Riddick's convictions. As the Supreme Court of the United States previously had left open the question of the lawfulness of warrantless home entries to conduct arrests, and because many state and federal courts were divided on the issue, the Supreme Court granted certiorari to address the constitutionality of New York's statutes that purported to authorize such warrantless entries. See Payton , 445 U.S. at 574-75, 100 S.Ct. 1371.
The Payton Court began by outlining the scope of its reasoning, expressly declining to address "other related problems that are not presented" by the cases at issue. Id. at 582-83, 100 S.Ct. 1371 (emphasis in original). The Court noted that neither case raised any question regarding exigent circumstances or consent to enter the home. Further, neither petitioner contended "that the police lacked probable cause to believe that the suspect was at home when they entered." Id. at 583, 100 S.Ct. 1371. Finally, and importantly herein, the Court observed that the cases did not "raise any question concerning the authority of the police, without either a search or arrest warrant, to enter a third party's home to arrest a suspect." Id. (emphasis added). Rather, the sole question at issue was the constitutionality of warrantless entries into a suspect's home in order to effectuate his arrest.
To resolve the narrow constitutional question presented, the Payton Court examined the foundational principles underlying the Fourth Amendment, its history and purpose, and its plain language. The Court reviewed the "familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that *381 motivated the framing and adoption of the Fourth Amendment." Id.[7] To limit the government's authority to deprive individuals of their security and privacy, the Fourth Amendment "contained two separate clauses, the first protecting the basic right to be free from unreasonable searches and seizures and the second requiring that warrants be particular and supported by probable cause." Id. at 584, 100 S.Ct. 1371. However, the protections afforded by the Fourth Amendment, the Court observed, extended farther than a mere prohibition of general warrants. Indeed, the Payton Court thought it "perfectly clear that the evil the Amendment was designed to prevent was broader than the abuse of a general warrant." Id. at 585, 100 S.Ct. 1371. By the Amendment's very wording, "[u]nreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the Amendment." Id. This prohibition, the Court explained, "applies equally to seizures of persons and to seizures of property." Id.
After reviewing the general nature of the Fourth Amendment's protections, the Payton Court turned to the status that the home enjoys thereunder. The significant fact at issue in both cases was the physical intrusion into a home, and the Court underscored that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Id. (quoting United States v. United States Dist. Court , 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ). Due to their inherent invasiveness, law enforcement entries into homes demand justification, and the Court noted that it has "long adhered to the view that the warrant procedure minimizes the danger of needless intrusions of that sort." Id. at 586, 100 S.Ct. 1371. The Court emphasized the cardinal principle that warrantless searches and seizures inside a home are presumptively unreasonable. Id.
For the Payton Court, the boundary delineated around private property rendered searches or seizures conducted therein different in kind from other actions that implicate the Fourth Amendment. For instance, contraband found in a public place may be seized without a warrant. Similarly, the seizure of contraband discovered in plain view violates no privacy interest and is presumptively reasonable. However, "[i]t is one thing to seize without a warrant property resting in an open area or seizable by levy without an intrusion into privacy, and it is quite another thing to effect a warrantless seizure of property ... situated on private premises to which access is not otherwise available for the seizing officer." Id. at 587, 100 S.Ct. 1371 (quoting G.M. Leasing Corp. v. United States , 429 U.S. 338, 352, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) ). The Payton Court approvingly quoted Judge Harold Leventhal's opinion in *382 Dorman v. United States , 435 F.2d 385 (D.C. Cir. 1970), which stated that, while warrantless arrests in public places are valid, "[a] greater burden is placed ... on officials who enter a home or dwelling without consent. Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." Payton , 445 U.S. at 587, 100 S.Ct. 1371 (quoting Dorman , 435 F.2d at 389 ).[8]
The Payton Court reviewed the New York Court of Appeals' reasoning in the cases at bar, noting that the state high court had concluded that there is a substantial difference in the relative intrusiveness of entering a home to search for property and entering a home to search for a person, as the search for property may require a more extensive examination of the relevant space. The Payton Court dismissed the purported distinction as "more theoretical than real," both because police officers may need to search the entire premises to locate a person, and because "sometimes they ignore the restrictions on searches incident to arrest." Id. at 589, 100 S.Ct. 1371. The Court's rejection of the distinction between persons and property, and between entries to search and entries to seize, was pivotal to its decision:
[T]he critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home-a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... houses ... shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States , 365 U.S. 505, 511 [81 S.Ct. 679, 5 L.Ed.2d 734] (1961). In terms that apply equally to seizures of property and seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.
Id. at 589-90, 100 S.Ct. 1371 (citation modified) (alterations in original).
Guided by these bedrock principles, the Payton Court held "that the Fourth Amendment to the United States Constitution ... prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Id. at 576, 100 S.Ct. 1371. The Court considered and rejected each of the government's arguments to the *383 contrary, concluding that historical common-law principles did not command a different result, that widespread approval of warrantless entries among the states did not control the constitutional analysis, and that its holding was not inconsistent with any legislative determination of policy. Id. at 591-602, 100 S.Ct. 1371. The Court concluded that "neither history nor this Nation's experience requires us to disregard the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." Id. at 601, 100 S.Ct. 1371.
Finally, the Payton Court addressed "the practical consequences of a warrant requirement as a precondition to a felony arrest in the home." Id. at 602, 100 S.Ct. 1371. The government contended that it would be unduly burdensome to require that police officers obtain a warrant before entering a residence. The Court disagreed:
In the absence of any evidence that effective law enforcement has suffered in those States that already have such a requirement, we are inclined to view such arguments with skepticism. More fundamentally, however, such arguments of policy must give way to a constitutional command that we consider to be unequivocal.
Id. (citation omitted). Notwithstanding its conclusion that the absence of a warrant was dispositive in the cases at bar, the Court went on to suggest a caveat. Specifically, and of significant importance to the cases that would follow, the Court proceeded to comment upon the authority that an arrest warrant would have provided, had one been obtained:
Finally, we note the State's suggestion that only a search warrant based on probable cause to believe the suspect is home at a given time can adequately protect the privacy interests at stake, and since such a warrant requirement is manifestly impractical, there need be no warrant of any kind. We find this ingenious argument unpersuasive. It is true that an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.
Id. at 602-03, 100 S.Ct. 1371.
Given that Payton 's ruling addressed the absence of any warrant, its discussion concerning the derivative authority of arrest warrants was dictum . However, in several subsequent decisions, the United States Supreme Court has referenced the Payton dictum in resolving related Fourth Amendment questions regarding the lawfulness of certain law enforcement activities in homes. See supra n.1. The year after the Payton decision, in Michigan v. Summers , 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the High Court addressed and upheld the temporary detention of an individual descending the steps of a house in which police officers were seeking to execute a search warrant. The Court relied upon the reasoning of its Payton dictum , noting that Payton "rejected the suggestion that only a search warrant could adequately protect the privacy interests at stake," because "the distinction between a search warrant and an arrest warrant was far less significant than the interposition of the magistrate's *384 determination of probable cause between the zealous officer and the citizen." Id. at 704, 101 S.Ct. 2587. The Court reasoned that Payton 's discussion of the derivative authority provided by an arrest warrant to search for an arrestee was relevant to an analysis of the derivative authority provided by a search warrant to seize an occupant of the searched premises. As such, the Summers Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Id. at 705, 101 S.Ct. 2587 (footnote omitted).
Justice Potter Stewart disagreed with the Summers Majority, reasoning that the Majority's holding countenanced seizures of persons unsupported by probable cause and posed a threat to the protections guaranteed by the Fourth Amendment. Justice Stewart found the Majority's invocation of Payton to be "perplexing," and observed that "the very point" of Payton 's dictum was "that the police would be justified in arresting a person in his own home because they had a warrant for his arrest based upon probable cause to believe that he had violated the criminal law." Id. at 710 n.2, 101 S.Ct. 2587 (Stewart, J., dissenting). Because it was "the absence of such probable cause" that was at issue in Summers , Justice Stewart "fail[ed] to understand Payton 's 'relevance.' " Id.
Almost a decade later, the Supreme Court again referenced the Payton dictum in addressing a question relating to law enforcement conduct inside a home. In Maryland v. Buie , 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Court held that, when police officers are executing an arrest inside a home, they may perform a "protective sweep" of the premises to ensure the absence of any individuals hidden therein that may pose a threat to their safety, so long as the officers possess "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 337, 110 S.Ct. 1093. The issue in Buie arose from police officers' entry into an arrestee's home to execute an arrest warrant. Notably, the lawfulness of that entry was not challenged. Citing the Payton dictum , the Buie Court noted that it was "not disputed that until the point of Buie's arrest the police had a right, based on the authority of the arrest warrant, to search anywhere in the house that Buie might have been found ...." Id. at 330, 110 S.Ct. 1093. The Court did not speak further to this point, as the sole issue before the Court was the validity of the subsequent "protective sweep."
The Court revisited the Payton dictum once again in Wilson v. Layne , 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). There, the Court considered the presence of members of the media while police officers executed an arrest warrant inside a home. The Court ultimately held that the presence of a reporter and photographer was unlawful, and that "it is a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant." Id. at 614, 119 S.Ct. 1692. In arriving at this conclusion, the Court recited the Payton dictum and noted that the officers possessed an arrest warrant and thus "were undoubtedly entitled to enter" the arrestee's home, but concluded that "it does not necessarily follow that they were entitled to bring a newspaper reporter and a photographer with them." Id. at 610-11, 119 S.Ct. 1692.
*385 In Summers , Buie , and Wilson , the Supreme Court referenced or in some manner relied upon the Payton dictum in resolving questions relating to the scope of law enforcement officers' authority to conduct certain actions inside a home. Although none of these decisions involved challenges to the initial entries at issue, and although none required the Court to assess the validity of the Payton dictum , the cited passages certainly suggest that the Supreme Court came to view its discussion in Payton as a binding rule of law. Importantly, however, like Payton , none of these three decisions implicated or considered any authority to enter a third party's residence to execute an arrest warrant.
Following Payton , it was abundantly clear that warrantless entries into a home to effectuate an arrest were unlawful. Granting that Payton 's dictum conferred upon law enforcement the authority to enter an arrestee's home to execute an arrest warrant, a significant question-one that Payton expressly identified as lying outside the scope of its decision-remained unresolved: the authority attending an arrest warrant to enter the home of a third party not identified in the warrant. Lower courts began to grapple with this issue immediately after the Payton decision was announced. In Wallace v. King , 626 F.2d 1157 (4th Cir. 1980), considering two civil rights actions pursuant to 42 U.S.C. § 1983 based upon allegedly unlawful home entries and searches for the subject of an arrest warrant, the United States Court of Appeals for the Fourth Circuit held that, the Payton dictum notwithstanding, "[r]easonable or probable cause to believe that a person for whom an arrest warrant has been issued is on the premises, standing alone, is not sufficient" to enter a third party's home, and that such entries require a search warrant supported by probable cause or a valid exception to the search warrant requirement. Id. at 1161. Similarly confronting an entry into a third party's home, the United States Court of Appeals for the First Circuit concluded in United States v. Adams , 621 F.2d 41, 44-45 (1st Cir. 1980), that such an entry required either a warrant or exigent circumstances.
The year following Payton , in Steagald , the Supreme Court resolved the third-party residence question. The issue in Steagald arose from an effort by agents of the United States Drug Enforcement Administration ("DEA") to apprehend a fugitive, Ricky Lyons. In January 1978, a confidential informant contacted a DEA agent in Detroit, Michigan, and suggested that he might be able to locate Lyons. During a second communication, the informant provided the agent with a telephone number in the Atlanta, Georgia area where Lyons purportedly could be reached during the next twenty-four hours. The agent relayed this information to Agent Kelly Goodowens in Atlanta. Agent Goodowens identified the address associated with the telephone number, and also discovered that Lyons was the subject of a six-month-old arrest warrant.
Two days later, Agent Goodowens and eleven other law enforcement officers drove to the address, seeking to apprehend Lyons. Outside the residence, the officers encountered two men, one of whom was later identified as Gary Steagald. After detaining and frisking both men, the officers determined that neither of them was Lyons. The officers approached the residence and a woman answered the door. She informed the officers that she was alone in the house. The officers detained her as well, and an officer searched the residence for Lyons. The officer did not find Lyons, but did observe what the officer believed to be cocaine. Agent Goodowens sent the officer to obtain a search warrant for the residence, but proceeded *386 to conduct a second search in the meantime. Once the search warrant was obtained, a third search of the residence was conducted, yielding forty-three pounds of cocaine. The residence having been determined to be Steagald's, he was arrested and charged with federal drug offenses.
Steagald sought suppression of all evidence recovered from the search of his residence, contending that the officers' entry was unlawful because it was conducted in the absence of a search warrant. At the suppression hearing, Agent Goodowens conceded that he could have obtained a search warrant before entering Steagald's residence, but stated that he deemed a search warrant unnecessary because the arrest warrant for Lyons sufficed to justify the entry and subsequent search. The United States District Court agreed with Agent Goodowens, and denied Steagald's suppression motion. Steagald was convicted, and the United States Court of Appeals for the Fifth Circuit affirmed. The Supreme Court granted certiorari in order to resolve the question left unanswered in Payton . See Steagald , 451 U.S. at 207, 101 S.Ct. 1642.
The Steagald Court began by acknowledging its holding in Payton "that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." Steagald , 451 U.S. at 211, 101 S.Ct. 1642. The Court acknowledged that the officers possessed a warrant-one that authorized the arrest of Lyons. However, the interest that purportedly was violated was not Lyons' interest in freedom from an unreasonable seizure. Instead, it was Steagald who asserted that the entry and search had violated his interest in the privacy of his home. Thus, the narrow issue before the Steagald Court was "whether an arrest warrant-as opposed to a search warrant-is adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances." Id. at 212, 101 S.Ct. 1642.
The Steagald Court focused upon the central purpose of the warrant requirement, which serves as a "checkpoint between the Government and the citizen," because a zealous officer investigating a crime "may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interests in protecting his own liberty and the privacy of his home." Id. (citing Coolidge v. New Hampshire , 403 U.S. 443, 449-51, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ; McDonald v. United States , 335 U.S. 451, 455-56, 69 S.Ct. 191, 93 L.Ed. 153 (1948) ; Johnson v. United States , 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) ). The warrant requirement applies equally to searches of places and seizures of persons, but those different actions implicate distinct Fourth Amendment interests:
[W]hile an arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review, the interests protected by the two warrants differ. An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.
*387 Id. at 212-13, 101 S.Ct. 1642. Thus, the Court observed, whether a warrant adequately protects Fourth Amendment interests depends upon what actions the warrant authorizes. See id. at 213, 101 S.Ct. 1642.
The arrest warrant for Lyons unequivocally reflected a judicial determination that there was probable cause to arrest Lyons. However, "the agents sought to do more than use the warrant to arrest Lyons in a public place or in his home; instead, they relied on the warrant as legal authority to enter the home of a third person based on their belief that Ricky Lyons might be a guest there." Id. at 213, 101 S.Ct. 1642. Regardless of whether the officers' belief was reasonable, "it was never subjected to the detached scrutiny of a judicial officer." Id. With that observation, the Steagald Court identified the critical distinction between the authority attending the arrest warrant and the authority that a search warrant would have provided, had one been obtained:
Thus, while the warrant in this case may have protected Lyons from an unreasonable seizure, it did absolutely nothing to protect [Steagald's] privacy interest in being free from an unreasonable invasion and search of his home. Instead, [Steagald's] only protection from an illegal entry and search was the agent's personal determination of probable cause. In the absence of exigent circumstances, we have consistently held that such judicially untested determinations are not reliable enough to justify an entry into a person's home to arrest him without a warrant, or a search of a home for objects in the absence of a search warrant. Payton v. New York , supra ; Johnson v. United States , supra . We see no reason to depart from this settled course when the search of a home is for a person rather than an object.
Id. at 213-14, 101 S.Ct. 1642.[9]
In a footnote, the Steagald Court further observed that the language of the Fourth Amendment makes no distinction between searches for persons and searches for objects, and that the warrant requirement applies without regard to the intended target of a search. "Specifically, absent exigent circumstances the magistrate, rather than the police officer, must make the decision that probable cause exists to believe that the person or object to be seized is within a particular place." Steagald , 451 U.S. at 214 n.7, 101 S.Ct. 1642. The Court recognized the apparent tension between the well-established purpose of the warrant requirement and the Payton dictum , but distinguished Payton based upon the primacy of third parties' privacy interests in their homes:
In Payton , of course, we recognized that an arrest warrant alone was sufficient to authorize the entry into a person's home to effect his arrest.... Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home. This analysis, however, is plainly inapplicable when the police seek to use an arrest warrant as legal authority to enter *388 the home of a third party to conduct a search. Such a warrant embodies no judicial determination whatsoever regarding the person whose home is to be searched. Because it does not authorize the police to deprive the third person of his liberty, it cannot embody any derivative authority to deprive this person of his interest in the privacy of his home. Such a deprivation must instead be based on an independent showing that a legitimate object of a search is located in the third party's home. We have consistently held, however, that such a determination is the province of the magistrate, and not that of the police officer.
Id.
For the Steagald Court, the absence of any judicial determination of probable cause as to Steagald's residence was dispositive. Two distinct Fourth Amendment interests were at stake: Lyons' interest in freedom from an unreasonable seizure of his person; and Steagald's interest in freedom from an unreasonable search of his home. "Because the arrest warrant for Lyons addressed only the former interest, the search of [Steagald's] home was no more reasonable from [Steagald's] perspective than it would have been if conducted in the absence of any warrant." Id. at 216, 101 S.Ct. 1642. As such, the entry into and search of Steagald's residence was equivalent to a warrantless search. Because no exception to the warrant requirement was applicable, the search violated the Fourth Amendment.
To rule otherwise, the Court cautioned, would be to confer upon law enforcement officers a sweeping authority that the Fourth Amendment does not tolerate. The Court emphasized the grave consequences that would follow if authorities were excused from satisfying the search warrant requirement before entering a third party's home:
A contrary conclusion-that the police, acting alone and in the absence of exigent circumstances, may decide when there is sufficient justification for searching the home of a third party for the subject of an arrest warrant-would create a significant potential for abuse. Armed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances. Moreover, an arrest warrant may serve as the pretext for entering a home in which the police have a suspicion, but not probable cause to believe, that illegal activity is taking place.
Id. at 215, 101 S.Ct. 1642 (citation omitted). The government acknowledged the potential for problems of this sort, but contended that existing remedies, such as suppression motions and actions for damages, were sufficient to redress any such wrongs. The Steagald Court disagreed, stressing that the Fourth Amendment "is designed to prevent, not simply to redress, unlawful police action." Id. (quoting Chimel v. California , 395 U.S. 752, 766 n.12, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) ).
Finally, the Steagald Court rejected the government's contention that it was impractical to require police officers to obtain a search warrant before entering a residence to effectuate an arrest. The government argued that, because people are inherently mobile, officers may be forced to return to a magistrate several times if the subject of the arrest warrant moves from place to place, and a requirement of this sort would be impractical. The Court disagreed, concluding that "a search warrant requirement will not significantly impede effective law enforcement efforts." Id. at 221, 101 S.Ct. 1642. First, the Court noted that numerous circumstances will excuse the failure to obtain a search warrant. The Court reiterated the Payton dictum that *389 "an arrest warrant alone will suffice to enter a suspect's own residence to effect his arrest." Id. The Court noted that no warrant is required to apprehend a suspected felon in a public place. Further, a search warrant will not be required where police officers are confronted with a true exigency. "For example, a warrantless entry of a home would be justified if the police were in 'hot pursuit' of a fugitive." Id. (citing United States v. Santana , 427 U.S. 38, 42-43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) ; Warden v. Hayden , 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) ). Thus, in circumstances where apprehending an individual presents a particularly time-sensitive difficulty, the Court was confident that "the exigent-circumstances doctrine is adequate to accommodate legitimate law enforcement needs." Id. at 222, 101 S.Ct. 1642.
Even if no exception to the warrant requirement applies, the Steagald Court was unpersuaded that the additional procedural step of obtaining a search warrant would substantially burden law enforcement efforts. The Court continued:
Moreover, in those situations in which a search warrant is necessary, the inconvenience incurred by the police is simply not that significant. First, if the police know of the location of the felon when they obtain an arrest warrant, the additional burden of obtaining a search warrant at the same time is miniscule. The inconvenience of obtaining such a warrant does not increase significantly when an outstanding arrest warrant already exists. In this case, for example, Agent Goodowens knew the address of the house to be searched two days in advance, and planned the raid from the federal courthouse in Atlanta where, we are informed, three full-time magistrates were on duty. In routine search cases such as this, the short time required to obtain a search warrant from a magistrate will seldom hinder efforts to apprehend a felon. Finally, if a magistrate is not nearby, a telephonic search warrant can usually be obtained. See Fed.Rule Crim.Proc. 41(c)(1), (2).
Whatever practical problems remain, however, cannot outweigh the constitutional interests at stake. Any warrant requirement impedes to some extent the vigor with which the Government can seek to enforce its laws, yet the Fourth Amendment recognizes that this restraint is necessary in some cases to protect against unreasonable searches and seizures. We conclude that this is such a case. The additional burden imposed on the police by a warrant requirement is minimal. In contrast, the right protected-that of presumptively innocent people to be secure in their homes from unjustified, forcible intrusions by the Government-is weighty. Thus, in order to render the instant search reasonable under the Fourth Amendment, a search warrant was required.
Id.
3. Discussion
Taken together, Payton 's dictum and Steagald 's holding stand for a principle that is clear enough in the abstract: police officers may enter the home of the subject of an arrest warrant to effectuate the arrest, but they must obtain a valid search warrant before entering the home of a third party. In the wake of these decisions, however, courts have struggled with the degree and manner of proof required to establish that a place is in fact an individual's residence-the central inquiry that would determine whether a given situation implicates Steagald 's holding or, instead, Payton 's dictum . As Professor Wayne LaFave framed the dilemma: "[w]ith Payton requiring an arrest warrant *390 for 'entry into the suspect's home' to arrest and Steagald requiring a search warrant where the arrest entry is of 'the home of a third party,' doubtless there will sometimes arise the question of which situation obtains in a particular case." 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 6.1(b) (5th ed. 2012) (hereinafter, "LaFave").
The difficulty is that both Payton and Steagald treated the concept of residence as absolute and immutable, drawing a bright line around a third party's residence, while affording a lesser degree of protection to an arrestee's residence. Payton 's articulated justification for entry ordinarily will apply to precisely one residence out of the universe of all possible residences, the remainder of which, Steagald holds, are inaccessible to police absent a search warrant or a recognized exception to the search warrant requirement. However, neither Payton nor Steagald provided guidance as to the manner by which a particular residence may be determined to be that of one individual or another.[10] The problem has not gone unnoticed by courts grappling with the application of these distinct rules. See United States v. Vasquez-Algarin , 821 F.3d 467, 480 (3d Cir. 2016) ("Like Payton , Steagald does not contemplate the possibility of uncertain residency, nor does it address the proper means of resolving that uncertainty.").[11]
While Professor LaFave ventures that the uncertain residence problem will "sometimes arise," the very nature of the inquiry presents some difficulty in virtually every case that implicates Payton or Steagald . One's place of residence is not an immediately apparent fact, ascertainable from knowledge of one's identity. Where a person makes her home may not be gleaned a priori . As one court has noted, "[i]n the real world, people do not live in individual, separate, hermetically-sealed residences. They live with other people, they move from one residence to another." Valdez v. McPheters , 172 F.3d 1220, 1225 (10th Cir. 1999). In nearly every conceivable circumstance, determining where an individual resides will require some type of investigation. As exemplified in the instant cases and in many like it, this investigation may involve acquiring relevant documents, questioning individuals with knowledge of a suspect's routine and likely location, or personally observing indicia of the subject's place of residence. In some instances, routine inquiries and common sense may make the location of a person's residence obvious. In other circumstances, a likely address may be more difficult to ascertain, or multiple possibilities may exist. Regardless of the content of any particular investigation, however, the determination of where an individual resides is an inference based upon the available information.
*391 The inevitable consequence is that sometimes the inference will be mistaken, and a third party's home will be erroneously identified as the home of an individual whom the police intend to arrest.
Likely in recognition that the uncertain residence problem substantially narrows the potential application of the Payton dictum , and underscored by the logic that "requiring actual knowledge of the suspect's true residence would effectively make Payton a dead letter," Valdez , 172 F.3d at 1225, federal courts have devised a two-pronged test for determining whether Payton applies to the entry into a home-a test based largely upon the language of Payton , but with one problematic deviation. The Payton dictum states: "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within ." Payton , 445 U.S. at 603, 100 S.Ct. 1371 (emphasis added). The prevailing test in numerous federal courts, by contrast, requires that "officers must have a reasonable belief the arrestee (1) lived in the residence, and (2) is within the residence at the time of entry." United States v. Gay , 240 F.3d 1222, 1226 (10th Cir. 2001) ; see also Valdez , 172 F.3d at 1224-25.
On its face, the Payton dictum applied the "reason to believe" standard only to the second prong-the presence of the arrestee within the residence at the time of the entry. As noted above, Payton took the first prong-the identification of the arrestee's residence-for granted, and provided no standard for ascertaining residence in future cases. Where the two-pronged test applies, however, exclusive focus is placed upon the information that the officer independently relied upon to form a "reasonable belief" regarding the residence of her target-information that is not subject to judicial review until well after the entry. Under this standard, the fact that an officer attempting to execute an arrest warrant in the subject's residence ultimately is mistaken, and consequently invades the home of a third party in apparent violation of Steagald , is immaterial, so long as the officer later testifies to having considered information that would support a "reasonable belief" as to residence.
The identification of one's residence is no triviality. When one establishes residence in a place, she distinguishes that space from all others, imbuing it with the personal significance that makes it a "home." Within its walls, she may expect the highest degree of security and privacy. The law has recognized and protected these interests with singular vigor since well before our nation's founding, and their sanctity is reflected in the Fourth Amendment's express proclamation of the "right of the people to be secure" in their houses. U.S. C ONST .amend. IV. Indeed, "when it comes to the Fourth Amendment, the home is first among equals." Florida v. Jardines , 569 U.S. 1, 6, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013). "At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " Id. (quoting Silverman v. United States , 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961) ).
With these principles in mind, we consider whether and to what extent the Payton dictum can be reconciled with Steagald , with the long-exalted status of the home in Fourth Amendment jurisprudence, and with the essential purpose of the warrant requirement. We first address the degree of proof required before a residence may be determined to be that of an arrest warrant's target, and specifically whether Payton 's use of the phrase "reason to believe" suggests a standard equivalent *392 to probable cause, or one less demanding. See Payton , 445 U.S. at 603, 100 S.Ct. 1371. This question long has divided the federal courts. Although a majority of federal courts once interpreted "reason to believe" as a requirement less stringent than probable cause, the Courts of Appeals now are nearly evenly divided on the issue. See Vasquez-Algarin , 821 F.3d at 474-75 & n.9.[12]
The recent decision of the United States Court of Appeals for the Third Circuit in Vasquez-Algarin provides a thorough and persuasive analysis of the distinctions, or lack thereof, between probable cause and Payton 's "reason to believe" standard, and aptly highlights the considerations and concerns germane to resolution of the issue. Vasquez-Algarin , like the cases before us today, involved a law enforcement entry into a third party's home to arrest the subject of an arrest warrant, where the authorities mistakenly believed their target to reside therein. Vasquez-Algarin described this circumstance as "a case of mistaken belief that underscores the tension between the residency test that the Courts of Appeals have derived from Payton and the relatively robust Fourth Amendment protections guaranteed to third-party homes under Steagald ." Id. at 473. The court stressed that a law enforcement officer's assessment of a suspect's residence essentially is a determination of the level of protection to be afforded that space, and, as such, the "choice about how much and what kind of information must form the basis for that critical determination thus affects not only the homes of arrestees but also any home that could be mistaken for one." Id.
The Vasquez-Algarin court focused upon the reasoning provided by other courts in interpreting Payton 's "reason to believe" language. The courts that have construed the "reason to believe" standard as less stringent than a probable cause requirement "have offered little by way of explanation for this interpretation." Id. at 474. The D.C. Circuit had suggested, for example, that it simply was "more likely ... that the Supreme Court in Payton used a phrase other than 'probable cause' because it meant something other than 'probable cause.' " Id. (quoting United States v. Thomas , 429 F.3d 282, 286 (D.C. Cir. 2005) ). Vasquez-Algarin recognized the Valdez court's concern that requiring "actual knowledge" of the suspect's residence would appear to defeat the purpose of the Payton dictum , see Valdez , 172 F.3d at 1225, but noted that the probable cause standard requires only a reasonable probability, and never has demanded actual knowledge. Vasquez-Algarin , 821 F.3d at 474.
By contrast, the courts that have construed the Payton dictum to require probable cause have relied upon the Supreme Court's use of the phrase "reason to believe" in both Payton and in other Fourth *393 Amendment cases, as well as the principles that guide Fourth Amendment jurisprudence generally. The Vasquez-Algarin court found this approach the more persuasive of the two. First, in Payton itself, the terms "reason to believe" and "probable cause" seemed to be used "in close proximity and interchangeably." Id. at 477. Further, echoing its dictum later in the opinion, the Payton Court noted that it was presented with no allegations "that the police lacked probable cause to believe that the suspect was at home when they entered." Payton , 445 U.S. at 583, 100 S.Ct. 1371 (emphasis added). Moreover, in using the phrase "reason to believe" as a substitute for probable cause, " Payton is not an anomaly." Vasquez-Algarin , 821 F.3d at 477. The court identified numerous instances in which the Supreme Court has used "reason to believe" in referring to "probable cause."[13] These examples, the court concluded, "serve to undercut the D.C. Circuit's conclusion that Payton 's 'reason to believe' should be construed loosely simply because the Court elected to use a phrase other than 'probable cause' ...." Id. at 478.
Although the Supreme Court's choice of phrasing in Payton and in numerous other decisions supported a probable cause standard, the Vasquez-Algarin court found that it was the nature and importance of the privacy interests at stake that necessitated it. The court noted that both Payton and Steagald primarily were driven by the unique significance of the home in the law of the Fourth Amendment. Payton and Steagald "together provide insight that neither case provides alone-insight that leads inexorably to the conclusion that the Circuit-created two-prong test is workable only if governed by a robust reasonableness standard akin to probable cause, and that anything less would defeat the 'stringent ... protection' the home is due." Id. at 479 (quoting United States v. Martinez-Fuerte , 428 U.S. 543, 561, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (private homes are "ordinarily afforded the most stringent Fourth Amendment protection") ).
Weighing the Supreme Court's articulated justifications in each decision, the Vasquez-Algarin court conceded that interpreting Payton 's "reason to believe" language too rigorously seemed at odds with the stated basis for the Court's suggestion-that the magistrate's determination of probable cause to arrest an individual "will suffice" to satisfy the warrant requirement, and that it thereafter becomes reasonable to demand that the individual open her own door to law enforcement. Payton , 445 U.S. at 602-03, 100 S.Ct. 1371. However, when Steagald is considered alongside this rule, and when the uncertain residence problem introduces a frequent possibility that entries under the Payton dictum will result in intrusions into third-party homes, a standard lower than probable cause becomes *394 unworkable. The Vasquez-Algarin court observed:
[W]here there is uncertainty about where the arrestee resides-a situation not presented in Payton but encompassed within the Circuit-created two-prong test-we must take care not to adopt an interpretation of "reason to believe" that requires of law enforcement so little evidence that an arrestee resides at a dwelling as to expose all dwellings to an unacceptable risk of police error and warrantless entry.
Vasquez-Algarin , 821 F.3d at 479.
In light of the principles that necessitated the Supreme Court's holding in Steagald , and considering the dangers posed by the uncertain residence problem, the Vasquez-Algarin court concluded that the Fourth Amendment cannot tolerate a standard lower than probable cause for a Payton entry. The court reasoned:
Like Payton , Steagald does not contemplate the possibility of uncertain residency, nor does it address the proper means of resolving that uncertainty. But read alongside Payton , the Court's reasoning in Steagald makes clear that its determination of the legality of a forced home entry in this context turns on whether the officer has the benefit of some type of probable cause determination by a neutral arbiter, be that by way of an arrest warrant or search warrant.
Given this precedent and the constitutional principles at stake, law enforcement armed only with an arrest warrant may not force entry into a home based on anything less than probable cause to believe an arrestee resides at and is then present within the residence. A laxer standard would effect an end-run around the stringent baseline protection established in Steagald and render all private homes-the most sacred of Fourth Amendment spaces-susceptible to search by dint of mere suspicion or uncorroborated information and without the benefit of any judicial determination. Such intrusions are "the chief evil against which the wording of the Fourth Amendment is directed." Payton , 445 U.S. at 585, 100 S.Ct. 1371. We therefore join those Courts of Appeals that have held that reasonable belief in the Payton context "embodies the same standard of reasonableness inherent in probable cause." Gorman , 314 F.3d at 1111 ; accord Barrera , 464 F.3d at 501.
Id. at 480 (citation modified).[14]
We agree with the Vasquez-Algarin court's reasoning, and similarly conclude that the authority contemplated by the Payton dictum cannot operate upon anything less than probable cause. However, this conclusion does not resolve the matter, nor does it relieve the inherent tension between Steagald and the Payton dictum . A more fundamental problem remains. Even if a Payton entry requires probable cause, the central concerns underlying the Steagald decision are not addressed unless the manner by which that determination is made comports with the essential purpose of the warrant requirement.
While the Commonwealth suggests that the Payton dictum did not apply in Steagald *395 because the officers believed Lyons to be a guest in the home, and not a resident thereof, see Brief for Commonwealth at 16, the dispositive distinction in Steagald was between the liberty interest of the arrestee and the privacy interest of a third party, and the Court's holding was compelled by the arrest warrant's satisfaction of the warrant requirement with regard to the former interest, but not the latter. The arrest warrant ensured that the seizure of Lyons was reasonable, but "it did absolutely nothing to protect" Steagald from "an unreasonable invasion and search of his home." Steagald , 451 U.S. at 213, 101 S.Ct. 1642. Instead, Steagald's only protection "was the agent's personal determination of probable cause." Id. The entry into and search of Steagald's residence was unlawful precisely because "such judicially untested determinations are not reliable enough to justify an entry into a person's home to arrest him without a warrant, or a search of a home for objects in the absence of a search warrant." Id. at 213-14, 101 S.Ct. 1642 (citing, inter alia , Payton ). In other words, with regard to the privacy of a third party's home, a warrant for another individual's arrest does not satisfy the essential purpose of the warrant requirement.[15] Instead, a search warrant reflecting a magisterial determination of probable cause is required.
Johnson v. United States , 333 U.S. 10, 13-14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).
Every search or seizure is a conflict between competing interests. The state has an interest in detecting, thwarting, and prosecuting crime, and the individual has an interest in freedom from unjustified intrusions upon her privacy or liberty. Law enforcement officers are the instrumentalities and representatives of the state's interest. Their duty is to enforce the law, to apprehend those who violate it, and to acquire evidence of those violations for use in future prosecutions. It is decidedly not a law enforcement prerogative to weigh the value of a given search or seizure against the rights of the individual whose interests necessarily will be compromised by it-rights that inevitably serve as hurdles to be overcome in the execution of essential law enforcement functions. The warrant requirement recognizes that effective law enforcement in a free society will involve a constant balancing of these divergent interests, and it interposes the independent judgment of the judiciary as a check upon the power inherent in the law enforcement process. To safeguard the individual's protected interests and to ensure that incursions upon the Fourth Amendment's essential rights are justified, the warrant requirement inherently mandates a procedure by which a neutral and detached magistrate determines that a contemplated search or seizure is supported by probable cause.
The magistrate's determination of probable cause is no technicality or mere formality; it is the foundational process that validates an intrusion that would otherwise be unreasonable. It is well-established that, in the absence of a warrant or a recognized exception to the warrant requirement, a search or seizure is presumptively unreasonable. See Schneckloth v. Bustamonte , 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ("It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable ... subject only to a few specifically established and well-delineated exceptions.' ") (quoting Katz v. United States , 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ) (alteration in original); Commonwealth v. Strickler , 563 Pa. 47, 757 A.2d 884, 888 (2000) ("A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies.").[16] This is the case even when a law enforcement officer acts upon information that, had it been presented to a magistrate, unquestionably would demonstrate probable cause. See Agnello v. United States , 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145 (1925) ("Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a *397 search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause."). This Court has observed that, under both the Fourth Amendment and our state charter:
It is not enough, absent exigent circumstances, that a policeman believe the facts he has are probable cause for a search warrant. The people of this state and nation are constitutionally entitled to an independent judicial determination of probable cause before they must open to the policeman's knock at the door in the night. See Johnson , 333 U.S. 10, 68 S.Ct. 367. Moreover, that determination must be made before and not after the search.
Commonwealth v. Chandler , 505 Pa. 113, 477 A.2d 851, 854 (1984) (citation modified).
This check upon the power of law enforcement is particularly significant when an investigation necessitates an intrusion into a home. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " Welsh v. Wisconsin , 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (quoting United States v. United States Dist. Court , 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ); accord Payton , 445 U.S. at 585, 100 S.Ct. 1371. It bears repeating that " Payton itself emphasized that [the] holding in that case stemmed from the 'overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.' " New York v. Harris , 495 U.S. 14, 17, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) (quoting Payton , 445 U.S. at 601, 100 S.Ct. 1371 ). "It is not surprising, therefore, that the Court has recognized, as a 'basic principle of Fourth Amendment law[,]' that searches and seizures inside a home without a warrant are presumptively unreasonable." Welsh , 466 U.S. at 748-49, 104 S.Ct. 2091 (quoting Payton , 445 U.S. at 586, 100 S.Ct. 1371 ) (quotation mark omitted; alteration in original); accord Kentucky v. King , 563 U.S. 452, 459, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011).
In light of these fundamental Fourth Amendment principles-the same principles that guided the actual holding of Payton -it is all the more difficult to reconcile the Payton dictum with Steagald and with the core teachings of Fourth Amendment jurisprudence. Particularly given the intractability of the uncertain residence problem, it cannot be the case that the lawfulness of an entry into a residence depends entirely upon a police officer's subjective assessment of a suspect's residence and the likelihood of finding the suspect therein. Such a construction of the Payton dictum effectively would operate as a license for a police officer to gauge conclusively the lawfulness of her own conduct-a conclusion that is manifestly inconsistent with the purpose of the warrant requirement and that categorically subverts the conceptual foundation of the Steagald decision.
Regardless of whether the officer seeking to execute an arrest warrant believes her target to reside in a given space, to be a guest staying there briefly, or merely to be present within, and even if the officer is to apply the well-understood probable cause standard to the inquiry, a unilateral assessment of probable cause is precisely the sort of "judicially untested" determination that is "not reliable enough to justify an entry." Steagald , 451 U.S. at 213, 101 S.Ct. 1642. With regard to any third party's privacy interest in the targeted space, the arrest warrant, standing alone, fails to satisfy the mandate of the warrant requirement. Consequently, when a third party is subject to an officer's mistaken *398 assumption-as all actors in the criminal justice process sometimes err-she is stripped of the privacy and security of her home under the authority of a document that bears the form of a warrant, but that, with regard to her protected interests, has no substance whatsoever.
These concerns are ever-present even though we know that most law enforcement officers seek to perform their duties in good faith and act without any intent to circumvent the requirements of the law. As the Steagald court stressed, a rule that would allow a law enforcement officer to act as her own magistrate, and to "decide when there is sufficient justification for searching the home of a third party," would "create a significant potential for abuse." Steagald , 451 U.S. at 215, 101 S.Ct. 1642. For instance, the arrest warrant could "serve as the pretext for entering a home in which the police have a suspicion, but not probable cause to believe, that illegal activity is taking place." Id.[17] Importantly, the Steagald Court cautioned that the derivative authority attending an arrest warrant cannot be construed as an authorization to invade an individual's home merely upon the basis of some connection between that individual and the intended arrestee, and further observed an unacceptable possibility that, "[a]rmed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances." Id.
It is this latter cautionary note that reorients us to the instant cases. Agent Finnegan testified that his conclusion that Moreno resided at 4745 North 2nd Street was driven, in part, by his understanding that relatives of Moreno lived at the address. N.T., 2/20/2015, at 12. Agent Finnegan recognized that there were other addresses where Moreno might be residing, but, in light of the information that he evaluated, he determined that 4745 North 2nd Street "seemed to be most likely." Id. As things turned out, Agent Finnegan was incorrect. Moreno did not live at 4745 North 2nd Street. In fact, Agent Finnegan never learned where Moreno was residing during the relevant time period. See id. at 35-36. 4745 North 2nd Street was the home of Romero and Castro, third parties unconnected to Moreno's offense and not implicated in the warrant for Moreno's arrest. With the exception of his familial connection to Moreno, Romero was not involved in any way. However, the records and information that Agent Finnegan acquired during the course of his investigation suggested to him that, notwithstanding what he later would learn, Moreno was associated, at least at some point in the past, with the residence at 4745 North 2nd Street. This circumstance plainly demonstrates the uncertain residence problem in such investigations.
" Steagald resolved that entry into a third party's home to arrest is judged by the standards applied to a search, not the standards applied to an arrest." Harbaugh & Faust, supra n.11, at 230-31. If the arrest warrant for Moreno did not reflect a judicial determination of probable cause to believe that a legitimate object of a search may be found within 4745 North 2nd Street, then Agent Finnegan's decision to enter that residence to search for Moreno was based upon precisely the sort of judicially untested determination that Steagald deems impermissible. The arrest warrant was designed to authorize Moreno's seizure.
*399 If that warrant did not establish probable cause to search the home, then the search of Romero's and Castro's residence "was no more reasonable" from their perspective "than it would have been if conducted in the absence of any warrant." Steagald , 451 U.S. at 216, 101 S.Ct. 1642.
The cases before us today inescapably implicate the core concerns in Steagald . Payton , as well as our previous decision in Stanley , supra n.6, were concerned only with an arrestee's rights, whereas today's cases are distinguishable as they relate to the rights of third parties. Steagald mandates suppression of the evidence at issue absent a search warrant for the third party's residence. But this does not conclude our inquiry. The lawfulness of police action cannot depend entirely upon facts gleaned afterward. It is no solution to rule that evidence must be suppressed when, in retrospect, it becomes clear that the search was of a third party's home and that probable cause never was established for it. By the time that the remedy of suppression becomes available, these third parties already will have been subjected to an unjustified incursion upon the privacy of their homes. They necessarily will have been arrested in their homes, charged with crimes, possibly subjected to lengthy pre-trial incarceration, exposed to professional and social opprobrium, and forced to defend against a prosecution and to litigate their rights in pre-trial motion practice. For these individuals, the remedy of suppression comes too late. Indeed, Steagald expressly rejected the notion that either suppression or civil penalties served as adequate remedies for unlawful intrusions into the home. See Steagald , 451 U.S. at 215, 101 S.Ct. 1642. After all, the Fourth Amendment "is designed to prevent, not simply to redress, unlawful police action." Chimel , 395 U.S. at 766 n.12, 89 S.Ct. 2034.
In prescribing a rule for future cases, we face an inexorable conflict between Steagald and the Payton dictum . Although the Payton dictum 's explication of an arrest warrant's derivative authority may be justified in theory, and although the Supreme Court has cited that dictum in subsequent decisions, the uncertain residence problem-acknowledged in neither Payton nor Steagald -renders the Payton dictum constitutionally suspect. We acknowledge that the High Court has appeared to recognize or to endorse the Payton dictum in several later cases, and, thus, we cannot lightly brush it aside as mere surplusage. Nonetheless, Steagald reflects a binding, majority holding from the United States Supreme Court, which directly addresses the third-party interest jeopardized by home entries of this sort. The Payton dictum , even if understood to reflect a controlling rule of law, concerned only the rights of an arrestee, implicated no third-party privacy interest, and served as a caveat to a decision that otherwise was driven by the essential protection of the home under the Fourth Amendment.
For constitutional purposes, when an investigation to locate an intended arrestee commences, any candidate residence potentially may be that of a third party, and entry into a third party's home can be justified only by a magisterial determination of probable cause, not merely by an officer's unchecked discretion. No matter how obvious the determination of a suspect's residence may seem, self-evidence as to location of the target of a search, as adjudged by a law enforcement officer, does not suffice to justify a warrantless entry to conduct a search for personal property, and it similarly cannot suffice for purposes of entering a home to search for and to apprehend a suspect. The search for an object inside of a home requires a search warrant, and the Steagald *400 Court saw "no reason to depart from this settled course when the search of a home is for a person rather than an object." Steagald , 451 U.S. at 214, 101 S.Ct. 1642.
The simple fact is this: no quantum of information, no degree of self-evidence regarding residence and presence changes the fact that the determination made from those considerations is precisely that-a determination. The Fourth Amendment for generations and with few exceptions, all generally involving some form of urgent necessity, clearly has denied law enforcement officers the discretion to make unilateral determinations of the authority to conduct a search or seizure-most jealously with respect to the home. The Payton dictum , taken at face value and elevated to the status of a rule, would subvert the long-understood mandate of the warrant requirement and the interests that it protects. Such a rule would create an unacceptable risk that unjustified entries will be deemed lawful despite their implication of the exact interests and considerations that required the Steagald Court to deem them unlawful. Failing to require a magisterial determination of probable cause to search a home, and instead gauging the lawfulness of an entry merely through a posteriori consideration of an officer's testimony at a hearing months later, where the result will hinge significantly or entirely upon a court's credibility determination, is an idiosyncratic and unpredictable standard that the Fourth Amendment cannot tolerate. The uncertain residence problem reveals difficulties that do not arise only in retrospect during judicial review; the question demands an answer before the intrusion occurs.
We cannot interpret the Payton dictum to approve of the intolerable consequence that homes may be searched without a warrant supported by probable cause simply on the strength of a police officer's mistaken assumption. Such a conclusion effectively would nullify the Steagald holding. In recognition of this, and until provided contrary guidance from the Supreme Court of the United States, we conclude that Steagald must control this area of Fourth Amendment law, and that the Payton dictum must yield to Steagald and to the volumes of earlier precedent regarding the protection of the home and the necessity of the warrant requirement.[18]
*401 Consistent with the reasoning of the Payton and Steagald decisions, we must not ignore the real-world consequences and the practical application of these rules. In both cases, the Supreme Court expressly considered and rejected arguments that a warrant requirement for home entries was unduly burdensome for law enforcement. We similarly conclude that effective law enforcement will not suffer from the burden of the search warrant requirement when seeking to enter a targeted residence. "First, if the police know the location of the felon when they obtain an arrest warrant, the additional burden of obtaining a search warrant at the same time is miniscule." Steagald , 451 U.S. at 222, 101 S.Ct. 1642. The police need only demonstrate probable cause to believe that their target may be found within a particular residence, and to obtain a search warrant for the premises.[19] When police obtain *402 an arrest warrant for an individual, but do not have information suggestive of the individual's location, a search warrant simply can be obtained when that information is discerned.
The Steagald Court stressed the availability of telephonic search warrants, and reasoned that "the short time required to obtain a search warrant from a magistrate will seldom hinder efforts to apprehend a felon." Id. Both the Federal Rules of Criminal Procedure and the Pennsylvania Rules of Criminal Procedure authorize applications for search warrants via electronic communication technology. See F.R.Crim.P. 41(d)(3) ("a magistrate judge may issue a warrant based on information communicated by telephone or other reliable electronic means"); Pa.R.Crim.P. 203(a) ("advanced communication technology may be used to submit a search warrant application and affidavit(s) and to issue a search warrant"). It bears noting that Steagald was decided in 1981; since then, the pervasiveness and efficiency of communication technology has grown exponentially.
Furthermore, the search warrant requirement never presents an insurmountable obstacle to the execution of essential law enforcement functions. If obtaining a magistrate's determination of probable cause to search a given premises becomes manifestly impracticable in a particular circumstance, the exigent circumstances exception to the warrant requirement remains an available alternative. This merely will require an officer to articulate the reasons that she was unable to obtain a search warrant before conducting an entry. As Justice Robert Jackson once opined, "[w]hen an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant." McDonald , 335 U.S. at 460, 69 S.Ct. 191 (Jackson, J., concurring).
In a common scenario, by way of example, police officers may encounter an intended arrestee in a public place, and are entitled to pursue their target should she flee into a residence. The Supreme Court of the United States has held that such a "hot pursuit" of a fleeing suspect into a home is lawful even where the police encounter a suspect standing in the doorway of a house. See Santana , 427 U.S. at 42-43, 96 S.Ct. 2406. When, as in such cases, the need to enter a residence is pressing, the exigent circumstances doctrine provides a *403 valid basis to excuse the failure to obtain a warrant. We are confident that this doctrine "is adequate to accommodate legitimate law enforcement needs." Steagald , 451 U.S. at 222, 101 S.Ct. 1642.
Granting that the exigent circumstances doctrine sufficiently addresses circumstances in which a warrant cannot be obtained, the only remaining consideration is that the need to obtain a magisterial finding of probable cause to search a particular residence is an inconvenience to law enforcement, and will make it more difficult to execute necessary law enforcement functions. However, "[t]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment." Mincey v. Arizona , 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). As the Johnson Court observed, "inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate" are "never very convincing reasons ... to bypass the constitutional requirement" of obtaining a warrant. Johnson , 333 U.S. at 15, 68 S.Ct. 367. Steagald recognized that "[a]ny warrant requirement impedes to some extent the vigor with which the Government can seek to enforce its laws," but held nonetheless that the "additional burden imposed on the police by a warrant requirement is minimal. In contrast, the right protected-that of presumptively innocent people to be secure in their homes from unjustified, forcible intrusions by the Government-is weighty." Steagald , 451 U.S. at 222, 101 S.Ct. 1642. The "minimal" burden of obtaining a search warrant, id. , is a small price to pay in order to protect against unjustified physical intrusions into homes-the "chief evil against which the wording of the Fourth Amendment is directed." Payton , 445 U.S. at 585, 100 S.Ct. 1371.
From all of the foregoing considerations, a simple and uniform rule emerges.[20] The Fourth Amendment protects the privacy interests in all homes. To overcome that privacy interest, a warrant used to enter a home must reflect a magisterial determination of probable cause to believe that the legitimate object of a search is contained therein. The form of the warrant is significant only in that it ordinarily signifies "what the warrant authorize[s] the agents to do." Steagald , 451 U.S. at 213, 101 S.Ct. 1642. That is, the central distinction between an "arrest warrant" and a "search warrant" is the identification of the particular person or place that the magistrate has found probable cause to seize or to search. If an arrest warrant is based solely upon probable cause to seize an individual, then it authorizes precisely that seizure. If entry into a residence is necessary to search for that individual, then the warrant must reflect a magisterial determination of probable cause to search that residence, regardless of whether the warrant is styled as an "arrest warrant" or a "search warrant."
*404 The critical inquiry is whether the warrant adequately addresses all of the Fourth Amendment interests that are implicated by the contemplated action.[21]
Only this result resolves the uncertain residence problem in a manner that honors the Steagald Court's evaluation of the interests protected by the warrant requirement, and that comports with the foundational principles embodied in the Fourth Amendment.[22] Moreover, a uniform and simplified standard serves only to benefit *405 law enforcement. Although it would in some way increase the breadth of their authority, a contrary rule similar to the federal courts' two-pronged Payton test forces law enforcement officers to make unilateral determinations of residence and likelihood of presence therein pursuant to an indeterminate standard, which injects uncertainty into the constitutional validity of their actions and hinges the admissibility of evidence seized pursuant thereto upon a court's later determination that the officers' subjective beliefs were reasonable or unreasonable. Law enforcement does not benefit from this type of uncertainty. Instead, where the standards applicable to search warrants uniformly apply to all residences, and where the officers must obtain valid warrants to enter and to search targeted premises, they can do so with the benefit of a presumption of lawfulness, and with knowledge that they can take full advantage of the plain view and search incident to arrest doctrines once inside.
In light of the foregoing, we conclude that the Fourth Amendment requires that, even when seeking to execute an arrest warrant, a law enforcement entry into a home must be authorized by a warrant reflecting a magisterial determination of probable cause to *406 search that home, whether by a separate search warrant or contained within the arrest warrant itself. Absent such a warrant, an entry into a residence is excused only by a recognized exception to the search warrant requirement.
III. Conclusion
Accordingly, the Superior Court's standard, that "[w]here authorities have a reasonable belief that the subject of an arrest warrant lives within a given premises, they can enter the home and arrest the suspect without a search warrant," Romero , 138 A.3d at 25, is constitutionally deficient. The question at issue in the instant cases is not whether the information related by Agent Finnegan, by itself, established a "reasonable belief" or "probable cause" to believe that Moreno resided at 4745 North 2nd Street. The question is whether, in obtaining the arrest warrant for Moreno, information sufficient to establish probable cause to search for Moreno at 4745 North 2nd Street was presented to and approved by a neutral and detached magistrate.
We have no reason to believe that the arrest warrant at issue in this case reflected such a probable cause determination. Yet, that warrant is not contained within the record, and we have no way of ascertaining its contents. We recognize that the parties presented their respective positions to the suppression court based upon prevailing Superior Court precedent, which did not require assessment of the contents of the arrest warrant, but mere evaluation of whether the information to which an officer later testifies supported a "reasonable belief" as to the residence of an arrestee. Because we have rejected the Superior Court's framework and established a new legal standard, and because parties whose cases are pending upon direct appeal ordinarily are entitled to the benefit of changes in the law, see In re L.J. , 622 Pa. 126, 79 A.3d 1073, 1082 (2013), we will not fault the Commonwealth for its failure to introduce the arrest warrant for Moreno in the first instance. It remains possible that the contents of that warrant reflected the magistrate's determination of probable cause to search Romero's and Castro's home, in which case the challenged entry was lawful. In the absence of such a finding, the suppression court correctly concluded that the challenged entry and search violated the Fourth Amendment, and the court did not err in ordering suppression of the derivative evidence.
Accordingly, we remand this case to allow the Commonwealth the opportunity to introduce the arrest warrant to the suppression court for consideration of the authority provided thereby, pursuant to the standard that we have articulated herein, and mindful of the fact that judicial review of a magistrate's determination of probable cause is limited to the consideration of the "four corners" of the affidavit of probable cause. See Commonwealth v. Coleman , 574 Pa. 261, 830 A.2d 554, 560 (2003) ; Pa.R.Crim.P. 203(B).
The order of the Superior Court is reversed, and the matter is remanded for further proceedings consistent with this Opinion.
Justices Todd and Donohue join the opinion.
Justice Mundy joins the mandate and Part II(A) of the opinion and files a concurring opinion.
Justice Dougherty files a concurring and dissenting opinion in which Chief Justice Saylor and Justice Baer join.

Herein, we refer to Payton 's closing comments on the derivative authority provided by an arrest warrant as "Payton 's dictum " or "the Payton dictum ." We distinguish this dictum from the "Payton holding," wherein the Payton Court, resolving the narrow issue presented to it, concluded that warrantless entries into a home to arrest a suspect are unconstitutional. See Payton , 445 U.S. at 603, 100 S.Ct. 1371. The Supreme Court has referred to the Payton dictum in several later decisions addressing related questions, but never has evaluated today's question directly. See Wilson v. Layne , 526 U.S. 603, 610-11, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (holding that police officers are prohibited from bringing reporters and photographers inside a home while executing a warrant); Maryland v. Buie , 494 U.S. 325, 330, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (holding that a "protective sweep" of a home for officer safety is lawful); Michigan v. Summers , 452 U.S. 692, 704-05, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (holding that police officers are authorized to detain occupants while executing a search warrant for a premises). As we discuss in detail, infra , the Supreme Court's subsequent references to the Payton dictum , as well as many lower courts' efforts to give it effect, have turned Payton 's discussion of arrest warrants into, as one court framed it, "a dictum that has since evolved into a tenet of Fourth Amendment jurisprudence." United States v. Vasquez-Algarin , 821 F.3d 467, 472 (3d Cir. 2016).

The Superior Court sua sponte consolidated the appeals because they arose from the same suppression order and implicated the same legal question. See Pa.R.A.P. 513.

The suppression court did not order the Commonwealth to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. The Commonwealth filed a statement nonetheless.

Notably, and as we discuss further, infra , the Superior Court's recitation of the above-discussed facts contained a number of statements unsupported by the record. With regard to the arrest warrant at issue, the Superior Court stated that "the warrant listed [Romero's and Castro's] address as Moreno's most likely place of residence." Romero , 138 A.3d at 23. The arrest warrant was not submitted into evidence at the suppression hearing and is not contained within the certified record on appeal, a fact that ultimately proves significant to our disposition herein. Further, there is no indication from the suppression record that 4745 North 2nd Street was listed on the arrest warrant. The Superior Court also stated that, when Agent Finnegan knocked on the door, either Romero or Castro "answered the door and permitted the authorities to enter the premises." Id. This characterization seems to be derived from the factual recitation in the suppression court's opinion, which, in context, was providing a summary of Agent Finnegan's testimony. See Suppression Ct. Op., 7/10/2015, at 3. However, Agent Finnegan's account of his entry was contradicted directly by Romero's credited testimony, and the suppression court's findings of fact at the conclusion of the hearing expressly state that Agent Finnegan "did not have the expressed permission to search the property from the defendants ...." N.T., 2/20/2015, at 53.

The Superior Court correctly observed that, when the Commonwealth appeals from an order granting suppression of evidence, an appellate court may "consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted." Romero , 138 A.3d at 25 (quoting Commonwealth v. Miller , 56 A.3d 1276, 1278-79 (Pa. Super. 2012) ). Because Romero did not contradict Agent Finnegan's account of his investigative process, the Superior Court concluded: "we must consider those facts on appeal and are bound by them because they are supported in the record." Id. at 27.

This Court has considered Payton and Steagald on one prior occasion. In Commonwealth v. Stanley , 498 Pa. 326, 446 A.2d 583 (1982), we addressed an arrestee's challenge to an entry into a third party's home. We concluded that Steagald was inapplicable because that decision "involved the Fourth Amendment rights of the third party owner ... and expressly did not adjudicate the rights of the suspect." Id. at 586 n.4. Because the third party's interest was not at issue in Stanley , and could not be asserted vicariously by the arrestee, we held that Steagald did not control. In the instant cases, by contrast, we are presented with third-party challenges-a circumstance that squarely implicates the Steagald decision.

As the Supreme Court has explained, the Fourth Amendment arose largely from the Framers' outrage at the abuses of the infamous "writs of assistance" in colonial America.
Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws. They were denounced by James Otis as 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,' because they placed 'the liberty of every man in the hands of every petty officer.'
Payton , 445 U.S. at 583 n.21, 100 S.Ct. 1371 (quoting Stanford v. Texas , 379 U.S. 476, 481-82, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965) ).

The Payton Court also expressly endorsed the summary of the relevant legal principles provided by the United States Court of Appeals for the Second Circuit:
To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present.
Payton , 445 U.S. at 588-89, 100 S.Ct. 1371 (quoting United States v. Reed , 572 F.2d 412, 423 (2d Cir. 1978) ). The Payton Court found this reasoning persuasive and consistent with its own Fourth Amendment jurisprudence. Id. at 589, 100 S.Ct. 1371.

We note that, in Summers , which was decided just two months after Steagald , the Court suggested, pursuant to its reading of the Payton dictum , that "the distinction between a search warrant and an arrest warrant was far less significant" than the fact of a magistrate's determination of probable cause. Summers , 452 U.S. at 704, 101 S.Ct. 2587. The disparate degree of emphasis that the Court placed upon the distinction between an arrest warrant and a search warrant in those cases is explained only by the implication of a third party's privacy interest in Steagald . Where a third party's interest is at stake, it becomes more significant whether a particular warrant adequately addresses that interest.

The above-discussed decisions in Summers , Buie , and Wilson , each of which referenced the Payton dictum , all similarly took the question of residence for granted, and did not consider the possibility of error in that determination.

See also Joseph D. Harbaugh & Nancy Lesse Faust, "Knock on Any Door"-Home Arrests After Payton and Steagald, 86 Dick. L. Rev. 191, 216 (1982) (hereinafter, "Harbaugh & Faust") ("The Payton decision used three terms to describe the premises that can be entered only with a warrant absent exigent circumstances-'residence,' 'home,' and 'dwelling.' The precise meaning of these terms is not clear from the opinion. Payton does not indicate when its warrant requirement applies to premises occupied on a temporary basis. The Steagald dissenters recognized this problem when they stated that a person's residence can acquire the status of a 'home' in 'a few days.' Therefore, lower courts must wrestle with determining what type of warrant is required for the particular premises.") (footnote omitted).

Several United States Courts of Appeals have concluded that Payton 's "reason to believe" standard requires less than a showing of probable cause. See , e.g. , Valdez , 172 F.3d at 1224-25 ; United States v. Werra , 638 F.3d 326, 337 (1st Cir. 2011) ; United States v. Thomas , 429 F.3d 282, 286 (D.C. Cir. 2005) ; United States v. Lauter , 57 F.3d 212, 215 (2d Cir. 1995). A similar number of Circuits have disagreed, interpreting "reason to believe" as requiring a showing of probable cause, or the functional equivalent of probable cause. See , e.g. , Vasquez-Algarin , 821 F.3d at 480 ; United States v. Hardin , 539 F.3d 404, 415-16 & n.6 (6th Cir. 2008) ; United States v. Barrera , 464 F.3d 496, 501 & n.5 (5th Cir. 2006) ; United States v. Gorman , 314 F.3d 1105, 1114-15 (9th Cir. 2002). Further, in United States v. Jackson , 576 F.3d 465 (7th Cir. 2009), the United States Court of Appeals for the Seventh Circuit suggested that it favored a probable cause standard, but declined to reach the issue. See id. at 469.

See Vasquez-Algarin , 821 F.3d at 477-78 (citing Berger v. New York , 388 U.S. 41, 59, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) ("The purpose of the probable cause requirement of the Fourth Amendment [is] to keep the state out of constitutionally protected areas until it has reason to believe that a specific crime has been or is being committed.") (emphasis added) (alteration in original); Gerstein v. Pugh , 420 U.S. 103, 114-15, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (noting the common-law function of a justice of the peace "to determine whether there was reason to believe the prisoner had committed a crime," which served as an "initial determination of probable cause" subject to review on a writ of habeas corpus ) (emphasis added); Cardwell v. Lewis , 417 U.S. 583, 592, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality) (recounting evidence that established "probable cause to search [the suspect's] car," and concluding that the resulting composite "provided reason to believe that the car was used in the commission of the crime") (emphasis added) ).

The Vasquez-Algarin court ultimately held that the evidence at issue must be suppressed notwithstanding the government's invocation of the Fourth Amendment's good-faith exception to the exclusionary rule. See generally United States v. Leon , 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Although we are presented in this case with no argument based in the more stringent privacy protections of Article I, Section 8 of the Pennsylvania Constitution, we note that our own constitutional jurisprudence does not recognize a good-faith exception to the exclusionary rule. See Commonwealth v. Edmunds , 526 Pa. 374, 586 A.2d 887, 905-06 (1991).

The Steagald Court went as far as comparing the use of an arrest warrant to enter a third party's home to the abuses of the historically reviled writs of assistance:
The central objectionable feature of both [general warrants and writs of assistance] was that they provided no judicial check on the determination of the executing officials that the evidence available justified an intrusion into any particular home. An arrest warrant, to the extent that it is invoked as authority to enter the homes of third parties, suffers from the same infirmity. Like a writ of assistance, it specifies only the object of a search-in this case, Ricky Lyons-and leaves to the unfettered discretion of the police the decision as to which particular homes should be searched. We do not believe that the Framers of the Fourth Amendment would have condoned such a result.
Steagald , 451 U.S. at 220, 101 S.Ct. 1642 (citation omitted).

To the extent that Justice Mundy views Payton "as its own constitutional rule" that would allow an entry to any home-third-party or otherwise-where a police officer possesses a valid arrest warrant and probable cause as to the residence of the suspect and the felt likelihood of the suspect's presence within, see Concurring Opinion at 407-08, it should be noted that a search conducted under these circumstances is, nonetheless, quite irreducibly, a search of a home without a search warrant . Although, on its face, the Payton dictum concerns entries into the home in the absence of a search warrant, it is telling that the Supreme Court of the United States never has identified or listed Payton as among the "few specifically established and well-delineated exceptions" to the search warrant requirement. Schneckloth , 412 U.S. at 219, 93 S.Ct. 2041.

See also Harbaugh & Faust, supra n.11, at 205-06 n.89 (noting that a Payton entry could operate in lieu of a search by increasing the likelihood of a "timed arrest," a type of arrest "that police schedule for a time at which they hope to discover not only the suspect, but also evidence of a crime").

Though he takes issue with our reference to the "Payton dictum ," our learned colleague Justice Dougherty concedes readily that the passage "was not the ultimate holding of Payton ." Concurring and Dissenting Opinion at 409. The concession confirms our point, as this is of course the very definition of dictum . See "obiter dictum ," Black's Law Dictionary 1240 (10th ed. 2014) ("A judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)."); c.f. "holding ," Black's Law Dictionary 849 (10th ed. 2014) ("A court's determination of a matter of law pivotal to its decision; a principle drawn from such a decision."). Our learned colleague Justice Mundy expresses a similar concern regarding our discussion of the Payton dictum , although she acknowledges the difficulties inherent in the uncertain residence problem, and further notes that the Payton Court did not contemplate the problems associated with applying such a rule to fugitives. Concurring Opinion at 407, 408. Of course, dicta often present risks of unforeseen complications and unintended consequences, which is why reliance upon them to resolve those same complications can be difficult to justify, if not ill-advised.
Justice Dougherty and Justice Mundy both would conclude that the Payton dictum must reflect a binding rule, since the Supreme Court of the United States referred to it in later cases, as we have discussed in this Opinion. To be sure, the several references to the Payton dictum in the High Court's subsequent decisions complicate the interpretive task. However, none of those subsequent decisions concerned the rights of third parties in the privacy interests in their homes. Even more importantly, none of those cases addressed the critical inquiry of how the determination of residency is to be made, and by whom. As the Court has reasoned in other contexts, "[n]one of these cases involved the question now under consideration, and the expressions referred to were clearly obiter dicta , which, as said by Chief Justice Marshall in Cohens v. Virginia , 6 Wheat. 264, 399, 5 L.Ed. 257 [ (1821) ], 'may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision.' " Williams v. United States , 289 U.S. 553, 568, 53 S.Ct. 751, 77 L.Ed. 1372 (1933). The subsequent treatment of the Payton dictum may be regarded as a fine example of the "progressive distortion" described by Justice Frankfurter, whereby "a hint becomes a suggestion, is loosely turned into dictum and finally elevated to a decision."United States v. Rabinowitz , 339 U.S. 56, 75, 70 S.Ct. 430, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting), overruled in part by Chimel v. California , 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). To be clear, our characterization of the Payton language as dictum is in no way intended to be pejorative, as Justice Dougherty seems to perceive it. See Concurring and Dissenting Opinion at 410 (describing our treatment of the Payton dictum as a "negative characterization"). All statements of the Supreme Court of the United States are entitled to respect, even if they are dicta . But merely because a dictum was written by that Court does not mean that we must, in every circumstance, "acknowledge it as controlling law." Concurring and Dissenting Opinion at 409. As Senior Judge Pierre N. Leval of the United States Court of Appeals for the Second Circuit has explained:
Anything the Supreme Court says should be considered with care; nonetheless, there is a significant difference between statements about the law, which courts should consider with care and respect, and utterances which have the force of binding law. The Supreme Court's dicta are not law. The issues so addressed remain unadjudicated. When an inferior court has such an issue before it, it may not treat the Supreme Court's dictum as dispositive. It must adjudicate.
Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta , 81 N.Y.U. L. REV. 1249, 1274 (2006) (emphasis added). The respect and care to which all of the High Court's statements are entitled are precisely why we have analyzed the issue herein at such length, rather than summarily dismissing the nonbinding passage of Payton , as we might when considering dicta from this or any other court. Nonetheless, dicta are dicta . Particularly when dicta are juxtaposed against clearly binding and irreconcilable precedent, we must choose the latter. "Dictum settles nothing, even in the court that utters it." Jama v. Immigration & Customs Enf't , 543 U.S. 335, 351 n.12, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005). And mere repetition of dicta in later decisions, where it does not control the disposition of a litigated issue, does not transform that dicta into controlling law. "Breath spent repeating dicta does not infuse it with life." Metro. Stevedore Co. v. Rambo , 515 U.S. 291, 300, 115 S.Ct. 2144, 132 L.Ed.2d 226 (1995).

Further, we do not rule out the possibility that the arrest warrant, itself, could establish probable cause to enter and to search a given premises. This "hybrid" warrant form would protect both the interests of the arrestee and the interests of any third party in the targeted premises. In discussing whether Payton and Steagald require both a search warrant and an arrest warrant, Professor LaFave notes:
Some language in Steagald suggests the answer is yes, as the Court at one point speaks of the possibility of the police obtaining a search warrant "when they obtain an arrest warrant." But there is no reason why this should inevitably be so, provided that whatever procedure has been utilized required the magistrate to pass on both the probable cause to arrest and the probable cause to search. This certainly could be accomplished by only a search warrant if the magistrate passed on the grounds for seizure of the named person just as, in the more typical search warrant situation, the magistrate would determine that the item of physical evidence to be seized is "the legitimate object of a search." And it could likewise be accomplished by process which happened to be labelled an arrest warrant if the document also authorized entry of a particular place and indicated that the magistrate had authorized such entry upon a showing of probable cause the named person was there. But because these hybrid search warrants and arrest warrants are out of the ordinary, and thus are attended by some risk that the magistrate will fail to make the additional probable cause determination they require, obtaining both an arrest warrant and search warrant is the safest (albeit not essential) course of action.
LaFave, § 6.1(b) (footnotes omitted; emphasis in original). While such "hybrid" warrants may be atypical, they provide a viable option. It is the embodiment of the magistrate's determination of probable cause that is significant, not the particular form that such a determination takes.

We are mindful that rules governing law enforcement conduct must be easily discernible and capable of clear and consistent application. As Professor LaFave has noted:
Fourth Amendment doctrine, given force and effect by the exclusionary rule, is primarily intended to regulate the police in their day-to-day activities and thus ought to be expressed in terms that are readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged. A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions ... may be literally impossible of application by the officer in the field.
Wayne R. LaFave, "Case-by-Case Adjudication" versus "Standardized Procedures": The Robinson Dilemma , 1974 Sup. Ct. Rev. 127, 141 (1974) (quotation marks and footnotes omitted).

We recognize that the Summers Court understood the Payton dictum as rejecting "the suggestion that only a search warrant could adequately protect the privacy interests at stake." Summers , 452 U.S. at 704, 101 S.Ct. 2587. However, the "privacy interests at stake" were only those of an arrestee, not any third party. Where third parties' homes are implicated, Steagald held precisely and directly to the contrary-that satisfaction of the search warrant requirement is the only adequate means to protect the privacy interests in those homes. Steagald , 451 U.S. at 222, 101 S.Ct. 1642.

Justice Dougherty finds fault in this approach, in that the search warrant requirement must be satisfied "every single time" that police officers "wish to search a residence for the subject of an arrest warrant." Concurring and Dissenting Opinion at 409. This articulation of the principle, on its face, provides it with strong support. Indeed, it is unequivocally and fundamentally our law that, when police officers "wish to search a residence" for a particular object of that search, they must obtain a search warrant or demonstrate the existence of a valid exception to the search warrant requirement "every single time." Further, the Supreme Court of the United States has made perfectly clear that the Fourth Amendment's warrant requirement does not distinguish between seizures of objects and seizures of persons, or between searches targeted at one or the other. "In terms that apply equally to seizures of property and to seizures of persons , the Fourth Amendment has drawn a firm line at the entrance to the house." Payton , 445 U.S. at 590, 100 S.Ct. 1371 (emphasis added); see also Steagald , 451 U.S. at 214 n.7, 101 S.Ct. 1642 ("[T]he plain wording of the Fourth Amendment admits of no exemption from the warrant requirement when the search of a home is for a person rather than for a thing."). The determination of when the right to privacy in one's home must yield to the needs of law enforcement belongs to the magistrate, not to the police officer. Moreover, a warrant cannot leave "to the unfettered discretion of the police the decision as to which particular homes should be searched." Steagald , 451 U.S. at 220, 101 S.Ct. 1642.
Justice Dougherty's approach disdains this uniform application of the search warrant requirement. He would "rely instead on the test devised by the federal courts in cases where there is a question regarding whether Payton or Steagald controls," and would apply Steagald only where the officer executing the arrest warrant "did not have a reasonable belief" that the "arrestee lived in the residence." Concurring and Dissenting Opinion at 410 (citing United States v. Gay , 240 F.3d 1222, 1226 (10th Cir. 2001) ). Respectfully, this test would resolve nothing. Not only does this framing omit the portion of the Payton dictum that would allow entry "when there is reason to believe the suspect is within" the residence, Payton , 445 U.S. at 603, 100 S.Ct. 1371, but it ultimately would leave the decision to enter any given residence to the unfettered discretion of an individual police officer. It could never be known prior to entry whether the entry is lawful. The legality of the police officer's actions would turn solely upon a court's later determination that the officer's belief was reasonable or unreasonable. Under this test, the role of the judiciary would be diminished to nothing more than provider of post hoc remedies for constitutional violations. This is not our law. It is axiomatic that the Fourth Amendment "is designed to prevent, not simply to redress, unlawful police action." Steagald , 451 U.S. at 215, 101 S.Ct. 1642 (quoting Chimel , 395 U.S. at 766, 89 S.Ct. 2034 ).
All of these problems similarly inhere in Justice Mundy's approach, regardless of whether one purports to apply Steagald 's reasoning before or after Payton 's. See Concurring Opinion at 406-07. Regardless of the order in which one considers the decisions, the result of applying the Payton dictum to justify entry into a third party's home is the same-a search of a home is conducted in the absence of a search warrant, without a magistrate's determination of probable cause to search that home, and the residents thereof are stripped of their Fourth Amendment protections by virtue of a document that is not in any way intended to authorize such a deprivation. To prioritize the Payton dictum in such situations is to vitiate Steagald entirely.